**NO. 23-1725**

In The

# United States Court Of Appeals
## For The Fourth Circuit

### GLORIA CARR,

*Plaintiff – Appellant,*

**v.**

### UNITED STATES OF AMERICA;
### LLOYD J. AUSTIN, The Secretary of Defense;
### CHRISTINE E. WORMUTH, Secretary of the Army,

*Defendants – Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALEIGH

————————

### BRIEF OF APPELLANT

————————

**Mark L. Hayes**
LAW OFFICE OF MARK L. HAYES
**P. O. Box 51387**
**Durham, NC  27717**
**(919) 926-7878**

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
206 East Cary Street  ♦  P.O. Box 1460 (23218)  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 23-1725          Caption: Gloria Carr v. US, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Gloria Carr
(name of party/amicus)

who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation?            ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?            ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?            ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational
victim of the criminal activity and (2) if an organizational victim is a corporation, the
parent corporation and any publicly held corporation that owns 10% or more of the stock
of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Mark L. Hayes                    Date:    7/17/2023

Counsel for: Gloria Carr

Print to PDF for Filing

# Table of Contents

**Page:**

Table of Authorities..................................................................iii

Jurisdictional Statement.............................................................1

Statement of the Issues..............................................................1

Statement of the Case...............................................................1

   I.    Procedural History ..............................................1

   II.   Factual Background ...........................................3

Summary of the Argument .......................................................6

Argument..................................................................................7

   I.    THE COURT ERRED IN DISMISSING PLAINTIFF-
         APPELLANT GLORIA CARR'S TITLE VII
         DISCRIMINATION CLAIM, WHEN HER
         COMPLAINT INCLUDED SUFFICIENT
         ALLEGATIONS THAT DEFENDANT-APPELLEES
         DISCRIMINATED AGAINST HER BASED ON
         RACIAL PREJUDICES ABOUT AFRICAN
         AMERICAN SUPERVISORS LIKE MRS. CARR .................7

      A.   Standard of Review ......................................7

      B.   Sufficiency of the Allegations .......................8

      C.   The Complaint Alleges a Direct Link Between
           Racial Bias and Mrs. Carr's Poor Treatment.............10

          I.    "African American Supervisors Cannot Hire
              GS-13 African Americans or Promote
              African Americans." ..........................................11

i

II.   "Yelling at the Plaintiff Like She is a Dog Again"................................................................ 14

III.  "African American Supervisors Had a 'Hook-Up' Culture" and "Made Decisions Based on Race"................................................. 15

IV.   "A Good Command of the English Language Unlike Her Peers." ............................. 18

D.   The Complaint is Sufficient to Put Defendants on Notice.................................................................... 20

Conclusion ...................................................... 22

Statement Requesting Review Without Oral Argument....................... 23

Certificate of Compliance....................................................... 24

# Table of Authorities

**Page(s):**

**Cases:**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ....................................................... 20

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ......................................................... 8

*Bing v. Brivo Sys., LLC,*
   959 F.3d 605 (4th Cir. 2020) ................................... 7, 8, 10

*Bryant v. Aiken Regional Medical Centers Inc.,*
   333 F.3d 536 (4th Cir. 2003) .......................................... 9

*Knight v. Nassau Cty. Civil Service Com'n,*
   649 F.2d 157 (2d Cir. 1981) ........................................... 11

*Lam v. Univ. of Hawai`i,*
   40 F.3d 1551 (9th Cir. 1994) ......................................... 19

*Laurent-Workman v. Wormuth,*
   54 F.4th 201 (4th Cir. 2022) .......................................... 18

*Mandell v. County of Suffolk,*
   316 F.3d 368 (2d Cir. 2003) ........................................... 15

*McCleary-Evans v. Md. Dep't of Transp. State Highway Admin.,*
   780 F.3d 582 (4th Cir. 2015) ......................................... 10

*Students for Fair Admissions, Inc. v.*
*President & Fellows of Harvard Coll.,*
   No. 20-1199 (June 29, 2023) .......................................... 12

*Sylvia v. Wisler,*
   875 F.3d 1307 (10th Cir. 2017) ..................................... 20

*Taylor v. City Nat. Bank,*
    642 F. Supp. 989 (S.D.W. Va. 1986) .........................................14-15

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
    570 U.S. 338 (2013) ...................................................................9

*Vega v. Hempstead Union Free Sch. Dist.,*
    801 F.3d 72 (2d Cir. 2015) .......................................................8

*Woods v. City of Greensboro,*
    855 F.3d 639 (4th Cir. 2017) ...................................................9

**Statutes:**

28 U.S.C. § 1291 .........................................................................1

28 U.S.C. § 1331 .........................................................................1

42 U.S.C. §§ 2000e-2000e17 ...............................................*passim*

42 U.S.C. § 2000e-2(a)(1) .........................................................8

**Rules:**

Fed. R. Civ. P. 3(c)(4) ...............................................................2

Fed. R. Civ. P 8(a)(2) ...............................................................8

Fed. R. Civ. P 12 .....................................................................10

Fed. R. Civ. P 12(b)(6) ...........................................................20

## Jurisdictional Statement

The District Court had jurisdiction of the case pursuant to 28 U.S.C. § 1331 because the case was based on Title VII claims brought under federal law.  After that Court's order on the Defendant-Appellee's motion to dismiss, which dismissed some but not all claims, and the Court's subsequent order on Defendant-Appellee's motion for summary judgment, which dismissed the remaining claim, Plaintiff-Appellant Gloria Carr filed timely notice of appeal.  This Court thus has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.

## Statement of the Issues

I.  The Court erred in dismissing Plaintiff-Appellant Gloria Carr's Title VII discrimination claim, when her complaint included sufficient allegations that Defendant-Appellees discriminated against her based on racial prejudices about African American supervisors like Mrs. Carr.

## Statement of the Case

I.  Procedural History

On 7 June 2021 Plaintiff-Appellant Gloria Carr filed a complaint in the Eastern District of North Carolina bringing claims under Title

VII for discrimination, hostile work environment, retaliation, and constructive discharge. JA12-16. Defendants filed a motion to dismiss all claims, after which Mrs. Carr filed an amended complaint and Defendants filed a motion to dismiss the amended complaint. JA29, JA54, JA69. The District Court entered an order on 1 March 2022 dismissing the discrimination, hostile work environment, and constructive discharge claims. It denied Defendants' motion to dismiss the retaliation claim. JA111. That order was therefore interlocutory.

Defendants filed their answer to the amended complaint on 15 March 2022, and they filed a motion for summary judgment on 28 November 2022. JA116, JA128. The District Court entered an order on that motion based on the briefs alone, without a hearing, on 24 May 2023. In that order the Court dismissed Mrs. Carr's retaliation claim, the final claim of her complaint. JA143. Mrs. Carr filed timely notice of appeal on 3 July 2023. JA159. The Hon. James C. Dever entered both District Court orders. Mrs. Carr may now appeal both the originally interlocutory order on the motion to dismiss as well as the order on the motion for summary judgment. Rule 3(c)(4).

II.    Factual Background

Plaintiff-Appellant Gloria Carr was a thirty-year employee of the Department of the Army ("the Employer"), where she served as Supervisory Contract Specialist and Director.  JA57, ¶ 21.  She received "numerous commendations and awards" during her employment. Ninety-six employees, including four division chiefs, were under Mrs. Carr's supervision.  JA59, ¶ 32; JA62, ¶ 56.  The division chiefs under her supervision had the authority to approve contracts with values up to $7,000,000.00.  JA59, ¶ 33.

Each year, Mrs. Carr was responsible for the procurement of contracts totaling between three billion ($3,000,000,000.00) and sixteen billion ($16,000,000,000.00).  JA63, ¶ 57.  She trained soldiers and contract personnel, briefed local businesses in Cumberland County, and represented the Mission and Installation Contracting Command "in all facets of the Fort Bragg community."  JA62-63, ¶ 57.

Mrs. Carr is an African-American woman.  JA58, ¶ 30.  Her immediate supervisor, Jerry King, informed Mrs. Carr in May 2015 that "African American Supervisors cannot hire GS-13 African Americans or promote African Americans."  JA56, ¶ 13.  The Department leadership

also alleged that African Americans in the department had a "hook up" culture. Within that supposed culture, African Americans including Mrs. Carr were believed to make supervisory decisions "based on race rather than job performance." JA59, ¶ 38.

Mrs. Carr's own supervisory authority then began to be undermined. Mr. King and Mrs. Carr's second level supervisor, Col. Carol Tschida, denied Mrs. Carr's exercise of her authority to make hiring decisions, to approve leave for subordinates, and to approve telework for subordinates. JA55, ¶ 12. Mr. King conducted a meeting in February 2016 in which he informed Mrs. Carr's division chiefs that they would no longer report to Mrs. Carr, but would instead report to Mr. King himself, thus bypassing Mrs. Carr. JA56. Mr. King also bypassed Mrs. Carr and went directly to her subordinate division chiefs. JA59, ¶ 16. While the division chiefs retained the delegated authority to approve contracts valued up to $7,000,000.00, Mrs. Carr was required to seek approval for contracts valued over just $150,000.00, even though Mrs. Carr was ostensibly still the supervisor over the division chiefs. JA59, ¶ 33.

When Ralph Barnes, a subordinate to Mrs. Carr, asked Mr. King why he was not allowing Mrs. Carr to perform her job, Mr. King replied that "command did not trust Plaintiff to perform her job," so they pulled her responsibilities to Mr. King and Col. Tschida.  JA56, ¶ 17.  Mr. King also yelled at Mrs. Carr in a manner which an observer noted was as if Mrs. Carr were a dog.  JA57, ¶ 19.

Mrs. Carr made an appointment with the EEO office and reported her poor treatment.  After returning from that appointment, she was told to attend a meeting with Mr. King later that same morning.  Mr. King informed Mrs. Carr that she was relieved of her duties.  JA61, ¶ 51.  Brigadier General Gabbert called in during that meeting and informed Mrs. Carr that she was being removed from her supervisory position because she was not doing her work.  The work to which BG Gabbert was referring, though, was actually the responsibility of Mr. King.  JA62, ¶ 52.

Mrs. Carr was then detailed to a new position where instead of supervising nearly a hundred employees, she supervised no one.  JA62, ¶ 56.  In her new demoted position as Technical Director, Mrs. Carr merely reviewed contracts prepared by others.  JA63, ¶ 58.  Mrs. Carr

suffered physical symptoms as a result, including ulcers, high blood pressure, and insomnia.  Rather than continue under those conditions, Mrs. Carr took an early retirement.  JA63, ¶ 62 and ¶ 63.

### Summary of the Argument

The District Court erred in dismissing Mrs. Carr's Title VII discrimination claim.  The Court's order did not challenge the adequacy of Mrs. Carr's complaint as to her protected status, her satisfactory qualification for her job, that she was treated poorly, and that she received a demotion.  It dismissed the claim for the sole reason that the complaint did not adequately allege that the demotion occurred because of Mrs. Carr's race or sex.  JA111-112.

This conclusion was erroneous, when Mrs. Carr alleged specific facts which linked expressly articulated racists policies to the particular negative treatment which Mrs. Carr received.  Mrs. Carr's superiors expressed that African American supervisors gave African American subordinates and job applicants preferential treatment because of their shared race.  JA59, ¶ 38.  To address this supposed problem, Mrs. Carr's supervisor Mr. King articulated a race-specific policy whereby African American supervisors were forbidden to hire or promote other African Americans.  JA56, ¶ 13.

The Employer then sharply limited Mrs. Carr's supervisory and hiring authority in her original position, and ultimately demoted her to a non-supervisory position. It was implementing the racist policy against African American supervisors which it had clearly articulated. The complaint thus more than adequately alleged facts which, if presumed true, establish that the Employer discriminated against Mrs. Carr because of her race.

## <u>Argument</u>

I.    THE COURT ERRED IN DISMISSING PLAINTIFF-APPELLANT GLORIA CARR'S TITLE VII DISCRIMINATION CLAIM, WHEN HER COMPLAINT INCLUDED SUFFICIENT ALLEGATIONS THAT DEFENDANT-APPELLEES DISCRIMINATED AGAINST HER BASED ON RACIAL PREJUDICES ABOUT AFRICAN AMERICAN SUPERVISORS LIKE MRS. CARR.

### A.    Standard of Review

This Court reviews *de novo* a District Court's order granting a motion to dismiss. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 615-16 (4th Cir. 2020). The Court must "accept as true the facts alleged" in the complaint and "construe the facts in the light most favorable" to the plaintiff as the non-movant. *Id*. at 608-609.

**B.    Sufficiency of the Allegations**

In order to survive a motion to dismiss, a complaint asserting a Title VII discrimination claim "must plausibly allege two elements: "(1) the employer discriminated against him (2) because of his race, color, religion, sex, or national origin." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015).  Put another way, the complaint must "allege facts to satisfy the elements of a cause of action created by that statute" under which the claim has been brought. *Bing*, 959 F.3d at 615-616.  For a plaintiff who has brought a discrimination claim under Title VII, this requires allegations that the employer "discharge[ed] any individual, or otherwise discriminat[ed] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." *Id.* at 616-617 (citing 42 U.S.C. § 2000e-2(a)(1)).

The allegations tending to prove the plaintiff's claim need not be detailed.  Rule 8(a)(2) only requires a "short and plain statement of the claim" which provides the defendant with "fair notice of . . . the grounds upon which [the claim] rests." *Id.* at 616 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

While a plaintiff may prove the discrimination in a variety of ways, no particular mechanism of proof is required. For example, while some plaintiffs make the connection between adverse treatment and racial discrimination by comparing their treatment to the employer's treatment of similarly-situated white employees, such comparisons are not necessary. *Bryant v. Aiken Regional Medical Centers Inc.*, 333 F.3d 536, 545 (4th Cir. 2003).

Likewise, a claim will stand even when the employer has only discriminated in certain contexts but not in others. It is sufficient to allege discrimination "in the context of more nuanced decisions that can be explained based upon reasons other than illicit bias, which, though perhaps implicit, is no less intentional." *Woods v. City of Greensboro*, 855 F.3d 639, 651-52 (4th Cir. 2017).

It is also unnecessary to allege that the "motive to discriminate" was the but-for cause of the wrongful employment action. "It suffices instead to show that the motive to discriminate was <u>one</u> of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013) (emphasis added).

Further, it is important to distinguish dismissal on a Rule 12 motion for dismiss from dismissal on a motion for summary judgment. A plaintiff need not present a prima facie case of discrimination to survive a Rule 12 motion to dismiss. *Bing*, 959 F.3d at 616.

A motion to dismiss is correctly granted, though, when the complaint only provides labels and conclusions. *McCleary-Evans v. Md. Dep't of Transp. State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015).

### C.    The Complaint Alleges a Direct Link Between Racial Bias and Mrs. Carr's Poor Treatment.

The District Court's 1 March 2022 dismissal order correctly noted that Mrs. Carr's complaint adequately alleged her protected status, her satisfactory qualification for her job, that she was treated poorly, and that she received a demotion. It dismissed the claim upon concluding that the complaint did not adequately allege that the demotion occurred because of Mrs. Carr's race or sex. JA111-112. This is the only contested issue on appeal.

The District Court erred in concluding that the complaint did not establish the Employer's racial motive. It ignored four key allegations which are more than sufficient to establish the racial basis for the discriminatory treatment.

10

I.     "African American Supervisors Cannot Hire GS-13 African Americans or Promote African Americans." (¶ 13).

First, the complaint alleges that Mrs. Carr's immediate supervisor, Jerry King, informed Mrs. Carr in May 2015 that "African American Supervisors cannot hire GS-13 African Americans or promote African Americans." JA56, ¶ 13. This statement includes two distinct indications of animus toward African Americans.

The statement first indicates that African American supervisors should have limited power and authority. This limitation on a particular racial group, with no apparent justification, indicates distrust based only on race. All of the conceivable reasons for this lack of trust smack of racism. For example, Mr. King's statement could indicate a belief that African Americans are particularly incompetent. It also could indicate that African Americans cannot be trusted to deal objectively with other African Americans. Presumptions about a racial group's competence and trustworthiness are both examples of racial prejudice. An employer unlawfully discriminates when it alters an employee's work duties based on racial stereotypes. *Knight v. Nassau Cty. Civil Service Com'n*, 649 F.2d 157, 162 (2d Cir. 1981) (holding that a plaintiff "assigned a particular job" based on presumed abilities arising from his race "is a violation of Title VII").

11

Second, Mr. King's statement also indicates his race-based aversion to African American <u>employees</u> as well as supervisors.  Even if he had stated that <u>all</u> supervisors, regardless of color, would not be allowed to hire or promote African Americans, that would still indicate racism towards African Americans as employees.  Whether Mr. King did not want African Americans to be hired because he believed they were incompetent, or simply because he did not want to be around them, his motivation is rooted in racial animus.  As recently discussed in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, No. 20-1199, at *76 (June 29, 2023), one of the most egregious examples of racism is to enact quotas to suppress the number of minority participants.  Harvard imposed such quotas in the 1930s against Jewish students.  The same racist theme is repeated here, where Mr. King expressed his intent to suppress the number of African-American employees at higher levels.

Thus Mr. King expressed animus toward both African American supervisors and African American employees with his statement.  Mrs. Carr occupied <u>both</u> of these roles.  She was an African American supervisor who, along with all other African American supervisors, Mr.

12

King did not believe should be allowed to exercise authority. Mrs. Carr was also an employee as to Mr. King -- an example of a promoted African American, which Mr. King clearly did not want to exist, since he wanted to limit African American promotions and hires. Mrs. Carr was in a position to exercise authority which Mr. King did not think African Americans could be trusted to possess, and she was in a position as an employee which Mr. King did not believe African Americans deserved to have.

Further, one cannot ignore the fact that Mr. King made this comment <u>directly to Mrs. Carr herself</u>. Perhaps the deepest root of racial animus besides outright violence is its expression through directly hurtful language. No African American supervisor could fail to take great offense at a blanket proclamation about all African American supervisors' authority. No African American employee could fail to take great offense from her direct supervisor telling her that African Americans should not be hired. When a supervisor makes a negative comment about a racial group <u>to his employee of that race</u>, one can infer that the natural result – great offense and discomfort – were inflicted <u>intentionally</u>.

From that inference, one can conclude that other negative treatment of Mrs. Carr arose from racial animus. One does not need for Mrs. Carr's subsequent transfer to a lower position to have its own individual racial component. The earlier racist comment about African American supervisors and employees, made directly to Mrs. Carr, colors Mr. King's later behavior toward her. His direct expression of racial animus permits the conclusion that his later acts also arose from racial animus.

II.    <u>"Yelling at the Plaintiff Like She is a Dog Again"</u> (¶ 19).

The "don't let African Americans hire African Americans" comment also fills in the motivation behind why Mr. King repeatedly yelled at Mrs. Carr like she was a dog. An observer saw Mr. King yelling at Mrs. Carr and noted that he was yelling at her "like she is a dog <u>again</u>," indicating that this was a repeated occurrence. JA57, ¶ 19. Alone, that allegation might only indicate that Mr. King had general animosity towards Mrs. Carr which only might have a basis in race.

In the context of his direct comment to Mrs. Carr about African Americans hiring African Americans, though, the yelling incident only confirms racial animus. Racism is fundamentally irrational. *Taylor v.*

*City Nat. Bank*, 642 F. Supp. 989, 995 (S.D.W. Va. 1986) (calling racism "inherently irrational"). In a professional setting, repeatedly yelling at someone so fiercely that an observer compares it to yelling at a dog indicates that the person yelling has lost all rational control. The existence of such raw animosity supports the conclusion that the yelling, like the yeller's earlier racist comments, is also the result of racial animus.

III.  "African American Supervisors Had a 'Hook-Up' Culture" and "Made Decisions Based on Race" (¶ 38).

The complaint also includes an allegation about a perceived conspiracy among African Americans. The CSB leadership alleged that African American supervisors had a "hook up" culture where they would hire other African Americans "based on race rather than job performance." JA59, ¶ 38. Conspiratorial notions that all members of a race group "stick together" are racist. *Mandell v. County of Suffolk*, 316 F.3d 368, 374 (2d Cir. 2003) (finding the comment that "all Jews stick together" anti-semitic). The "hook-up" conspiracy also presumes that an African American cannot be hired on merit, so any hires must be the result of something nefarious.

Further, it is significant that a "hook up" culture conspiracy would logically result in negative treatment of African American supervisors which exactly matches the treatment Mrs. Carr, an African American supervisor, actually received. If management believes that African American supervisors make their hiring and promotion decisions for some reason other than merit, then one would expect management to block African American supervisors from making such decisions.

That is exactly what happened with Mrs. Carr. Mr. King informed Mrs. Carr's subordinates that they should report directly to him. JA60, ¶ 45(d). Mrs. Carr was denied "hiring authority, authority to approve leave," and authority to approve "telework for her employees." JA60, ¶ 45(a). And, as discussed, Mr. King informed Mrs. Carr that African American supervisors could not hire or promote GS-13 African Americans. (JA60, ¶ 45(b).

The Employer first took a piecemeal approach, leaving Mrs. Carr in her same position but peeling away her authority, limiting her ability to direct subordinates. When those efforts proved insufficient, the Employer took a more direct approach by removing Mrs. Carr from her original position and detailing her to the Technical Director position.

16

JA60, ¶ 42. While she had originally supervised nearly 100 people, her new position eliminated her ability to supervise anyone at all. JA62, ¶ 56. If an employer has a racist belief that African American supervisors "hook up" African American subordinates, then the most definitive way to stop that conspiracy would be to remove the African American supervisors from those positions. That removal occurred for Mrs. Carr.

If Mrs. Carr had only endured negative treatment which had nothing to do with her role as a supervisor – for example, if she had been forced to park in a distant lot, or if she had been moved to an uncomfortable office – that treatment would have a more tenuous connection to the racist comments. A factfinder would be left to infer that the racist comments established a general racial animus which motivated all subsequent negative treatment.

Here, though, the connection is much more direct. The negative treatment was tailored to eliminate Mrs. Carr's supervisory power in light of allegations that all African American supervisors abused their power. The racist comments and the subsequent negative treatment both concerned supervisory authority.

While undercutting an African American supervisor is not racist unto itself, it is clearly racist when the person doing the undercutting has expressed that all African American supervisors abuse their authority and should have that authority limited. It is even more clearly racist when the person doing the undercutting has directly told <u>that very person</u> that African American supervisors – which obviously included Mrs. Carr herself – will not be allowed to hire or promote other African Americans. The racist comment and policy unfairly discriminates against both supervisors and employees who are African American.

IV.  "<u>A Good Command of the English Language Unlike Her Peers</u>."  (¶ 39).

Mr. King also commented to Mrs. Carr that she "had a good command of the English language unlike her peers." JA59, ¶ 39. This backhanded compliment invokes an "odious trope about African American speech patterns." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022). It reiterates Mr. King's apparent belief that when an African American presents as an articulate and intelligent person, she is an exception to the general rule. This in turn establishes that Mr. King has deep-seeded and negative beliefs about African Americans as a group.

18

Although in the particular area of speech Mr. King apparently found Mrs. Carr to be the exception, the existence of one stereotypical belief tends to indicate the existence of other accompanying beliefs. Stereotypical belies are often bundled into sets. *Lam v. Univ. of Hawai`i*, 40 F.3d 1551, 1562 (9th Cir. 1994) ("Like other subclasses under Title VII, Asian women are subject to a set of stereotypes"). If nothing else, the belief that African Americans tend to be inarticulate establishes that Mr. King found it appropriate to draw conclusions about an entire racial group. That inference only bolsters the veracity of Mrs. Carr's allegation that Mr. King and other members of the leadership had drawn conclusions about African American supervisors, and that the leadership was confident enough in its conclusions to restrict and usurp the authority of African Americans.

In other words, in isolation Mr. King's racist comment about speech might have had only a tangential connection to the attacks on Mrs. Carr's authority as a supervisor. Within the context of Mr. King's other racist comments about African American supervisors, though, the "good English" comment further bolsters the racial motive behind the poor treatment of Mrs. Carr.

## D. The Complaint is Sufficient to Put Defendants on Notice.

Under notice pleading as articulated by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), a complaint need not be replete with detail in order to survive a Rule 12(b)(6) motion to dismiss. Instead, it need only "ensure that a defendant is placed on notice of his or her alleged misconduct sufficient to prepare an appropriate defense." *Sylvia v. Wisler*, 875 F.3d 1307, 1326 (10th Cir. 2017).

Mrs. Carr's complaint provides that notice. It specifically alleges particular historical acts which would establish Mrs. Carr's discrimination claim, and which the Employer will need to disprove. No doubt Mr. King and Mrs. Carr will provide conflicting depositions, affidavits, and then testimony about whether Mr. King in fact stated that all African American supervisors were forbidden from hiring other African Americans. Because the reduction of Mrs. Carr's authority and ultimate transfer to a non-supervisory position is likely beyond dispute, the Employer will certainly try to present evidence indicating that it took those actions for a reason other than race, like competence. Mrs. Carr will present her own evidence in rebuttal, to support the

20

contentions from her complaint that she was a well-regarded, repeatedly commended, long tenured career supervisor.

Mrs. Carr will also no doubt present testimony as to the "hook up" culture conspiracy which her complaint alleges was relied upon by the leadership team in her office. She may seek depositions and testimony from Mr. King, Col. Tschida, BG Gabbert, and other members of the leadership, or from other employees who heard comments from those officials. The Employer will likely attempt to present evidence that no such conspiracy beliefs existed, using direct denials from those supervisors.

In short, the complaint sets out a very predictable course of litigation all focused on one main question: whether stereotypical beliefs about all African American supervisors existed and were expressed, and whether they provided the motive for the reduction and eventual elimination (by demotion) of the supervisory authority of Mrs. Carr. At least some of the statements which reveal those prejudiced beliefs have already been expressly identified. Likewise, the identities of those ascribing to this conspiracy, and who had authority over Mrs. Carr, are also known. The Employer has abundant notice of how Mrs. Carr will

attempt to prove her case and what sorts of evidence it will need to produce in rebuttal.  Therefore the dismissal was premature and improper.

### Conclusion

The dismissal of Mrs. Carr's Title VII discrimination claim should be vacated and her claim reinstated.

Respectfully submitted, this the 21st day of August, 2023.

/s/ Mark L. Hayes
Mark L. Hayes
LAW OFFICE OF MARK L. HAYES
P.O. Box 51387
Durham, N.C. 27717
markhayes@appealnc.com
(919)926-7878

*Counsel for Plaintiff-Appellant*

22

## **Statement Requesting Review Without Oral Argument**

Plaintiff-Appellant Gloria Carr respectfully requests that this Court review her case on appeal based on the briefs alone.  The issue she has raised involves the sufficiency of the allegations in the complaint, which are plain on their face.   Oral argument would therefore only impose an unnecessary expense on both parties.

## <u>Certificate of Compliance</u>

1. This document complies with type-volume limits because,

   excluding the parts of the document exempted by Fed. R. App. P.

   32(f) (cover page, disclosure statement, table of contents, table of

   citations, statement regarding oral argument, signature block,

   certificates of counsel, addendum, attachments):

   this document contains <u>4,016</u> words.

2. This document complies with the typeface requirements because:

   This document has been prepared in a proportional spaced
   typeface using <u>Microsoft Word</u> in <u>14-point Century
   Schoolbook font.</u>

/s/ Mark L. Hayes
Mark L. Hayes
LAW OFFICE OF MARK L. HAYES
P.O. Box 51387
Durham, N.C. 27717
markhayes@appealnc.com
(919)926-7878

*Counsel for Plaintiff-Appellant*
